UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

CESAR TUEROS,

               Defendant.

------------------------------------X

S4 10 Cr. 222-3 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

      On June 28, 2012, Cesar Tueros ("Tueros" or "Defendant") allocuted to his guilt on one count of conspiracy to distribute and possess with intent to distribute five grams and more of cocaine, in violation of 21 U.S.C § 841(b)(1)(B). For the reasons set forth below, Tueros will be sentenced to 80 months' imprisonment to be followed by 4 years' supervised release. Tueros will forfeit to the United States all property involved in the offense or traceable to it. Tueros will also be required to pay a special assessment of $100.

**Prior Proceedings**

      On April 18, 2011, Indictment S4 10 CR 222 (RWS) was

1

filed in the Southern District of New York.

Count 1 charges that from at least October 2009, through and including March 4, 2010, in the Southern District of New York and elsewhere, Tueros, Vladimir Alexis Morillo-Vidal, a/k/a "Vladimir Morillo" ("Morillo"), John Cartagena ("Cartagena"), and others known and unknown, conspired to distribute and possess with intent to distribute five grams and more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A).

On June 28, 2012, Tueros appeared before United States Magistrate Judge James C. Francis and allocuted to his guilt to the above charge in accordance with a plea agreement. Under the terms of the plea agreement, the Government accepted a guilty plea to the lesser included offense of conspiracy to distribute and possess with intent to distribute 500 grams and more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(B).

Tuero's sentencing is currently scheduled for December 3, 2012.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B) to afford adequate deterrence to criminal conduct;

   (C) to protect the public from further crimes of the defendant; and

   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

   (A) the applicable category of offense committed by the applicable category of defendant as

>                 set forth in the guidelines . . .;
>
> (5)   any pertinent policy statement . . . [issued
>       by the Sentencing Commission];
>
> (6)   the need to avoid unwarranted sentence
>       disparities among defendants with similar
>       records who have been found guilty of
>       similar conduct; and
>
> (7)   the need to provide restitution to any victims of
>       the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 114-15.

**The Defendant**

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Tuero's personal and family history.

**The Offense Conduct**

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that report.

4

On February 28, 2010, an officer with the Nebraska State Patrol ("Officer-1") conducted a traffic stop of a Recreational Vehicle ("RV"). Officer-1 obtained identification from the passenger of the RV that identified him as Cartagena. Officer-1 also obtained identification from the driver of the RV ("CC-1"). Cartagena told Officer-1 that he and CC-1 were headed to New York. Officer-1 obtained oral consent to search the RV from CC-1 and discovered, in a storage area within the RV, approximately 67 kilograms of cocaine. Officer-1 placed Cartagena and CC-1 under arrest.

Another officer of the Nebraska State Patrol ("Officer-2") read CC-1 his Miranda rights, which he waived, and agreed to speak with law enforcement agents. CC-1 admitted that he and Cartagena had separately flown to Phoenix, Arizona, and were transporting the cocaine to New York City. CC-1 later testified at the instant trial, and indicated that CC-1 and Cartagena rented the RV, bought tools to hide the cocaine in the RV and also bought latex gloves to handle the cocaine. Receipts for these items, among others, corroborated CC-1's account. CC-1 also testified that CC-1 and Cartagena concocted a story about a ski trip to tell police officers if they were stopped. Both CC-1 and Cartagena lied to Officer-1 during the traffic stop by

telling Officer-1 that they had gone skiing.

CC-1 told law enforcement agents on March 2, 2010, that CC-1 and Cartagena were previously involved in trafficking 23 kilograms of cocaine. CC-1 later testified that CC-1 took 21 of the kilograms of cocaine and drove to New Jersey where CC-1 met with Tueros. CC-1 and Tueros unloaded the cocaine from CC-1's truck into a suitcase and took a car service to an apartment in Manhattan. Tueros subsequently sold the cocaine. CC-1 also testified that in October 2009, Tueros traveled by airplane from New York to Phoenix, Arizona, with narcotics proceeds hidden in electronic equipment. Tueros met CC-1 in Arizona as CC-1 had traveled there separately from Tueros. CC-1 said that after delivering the cocaine, CC-1 asked Cartagena to accompany him again during a subsequent delivery of the payment of $250,000. In October 2009, CC-1 and Cartagena flew from New York to Los Angeles, California, to deliver the $250,000 which they had hid in electronic equipment.

Cartagena was also interviewed by law enforcement agents on March 2, 2010, and stated that he and CC-1 were on their way to New York. Cartagena also stated that a few days before Halloween in 2009, Cartagena and CC-1 had flown with

approximately $250,000 from New York to Los Angeles, California. Cartagena stated he was trying to make money to assist with his financial situation.

CC-1, under the direction of the Drug Enforcement Administration ("DEA"), delivered what appeared to be 47 kilograms of the cocaine recovered on February 28, 2010 to another defendant not named herein ("CC-2") in Sloatsburg, New York, on March 3, 2010. That same day, CC-1 and Tueros spoke by telephone regarding the delivery of the cocaine.

On March 4, 2010, CC-2, also working under the direction and monitoring of the DEA, made several phone calls to an individual known as "Bu Bu" (who has not yet been apprehended) regarding the 47 kilograms of cocaine that was to be delivered to Bu Bu. During the recorded call, Bu Bu informed CC-2 that his "brother" would meet with CC-2 in order to collect the cocaine.

On March 4, 2010, under the direction and monitoring of the DEA, CC-2 spoke with Morillo-Vidal, who is believed to be the "brother" referred to by Bu Bu based on a statement Morillo-Vidal made to CC-2 that was overheard by a law enforcement

agent, several times on the telephone. Morillo-Vidal informed CC-2 that he was en route to meet CC-2 and provided a description of himself and the vehicle he was driving. CC-2 informed Morillo-Vidal that CC-2 would meet him at a restaurant in Manhattan (the "Restaurant") and that CC-2 would be waiting for him upstairs.

Later in the evening on March 4, 2010, and under the direction and monitoring of the DEA, CC-2 met with Morillo-Vidal at the Restaurant. When Morillo-Vidal arrived, Morillo-Vidal entered the Restaurant and walked upstairs. Morillo-Vidal introduced himself to CC-2 and told CC-2 "you spoke with my brother," which is believed to be a reference to Bu Bu. CC-2 then pointed out CC-2's vehicle to Morillo-Vidal.

CC-2 and Morillo-Vidal exited the Restaurant and walked towards CC-2's vehicle. CC-2 opened the hatch of CC-2's vehicle which contained two bags of what appeared to be cocaine. One of the bags was unzipped. Morillo-Vidal inspected the unzipped bag, removed one bag from CC-2's vehicle, and began to walk towards his vehicle with the bag.

Law enforcement agents then placed CC-2 and Morillo-

Vidal under arrest.

Morillo-Vidal was read his Miranda rights, which he waived, and stated that he went to the Restaurant at the direction of Bu Bu. Morillo-Vidal stated that he was unaware that he was picking up narcotics. Morillo-Vidal continued to state that he was there to pick up clothing for a friend who owns a clothing store. Morillo-Vidal stated that the meeting was arranged four days ago and that he had no phone contact with anyone on March 4, 2010, in regards to the meeting at the Restaurant that day. However, phone records showed that Morillo-Vidal had telephone contact with CC-2 and Bu Bu that day.

Tueros was arrested in the Southern District of Florida on April 17, 2011.

**The Relevant Statutory Provisions**

For Count 1, pursuant to 18 U.S.C. § 841(b)(1)(B), the mandatory minimum term of imprisonment is 5 years and the maximum term of imprisonment is 40 years.

For Count 1, if a term of imprisonment is imposed, a term of at least 4 years supervised release is required and the maximum term of supervised release is life, pursuant to 18 U.S.C. § 841(b)(1)(B).

For Count 1, Defendant is not eligible for probation because the instant offense is one for which probation has been expressly precluded by statute, pursuant to 18 U.S.C. § 3561(a)(2) and 21 U.S.C. § 841(b)(1)(B).

The maximum fine that may be imposed is the $5,000,000, pursuant to 21 U.S.C. § 841(b)(1)(B). A special assessment of $100 is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2010 edition of the <u>United States Sentencing Commission Guidelines Manual</u> has been used in this case for calculation purposes, pursuant to § 1B1.11(a). The Court finds the following with respect to Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

The guideline for a violation of 21 U.S.C. § 846 is found in § 2B1.1. According to the Defendant's plea agreement, the offense involved at least 15 kilograms but less than 50 kilograms of cocaine. The offense level specified in the Drug Quantity Table under § 2D1.1(c)(3) sets a base offense level of 34.

Based on the Defendant's plea allocution, the Government believes that the Defendant has shown recognition of responsibility for the offense. Because of the Defendant's timely notification of his intention to plead guilty, thus allowing the Government to allocate its resources more efficiently, and because the aforementioned base offense level is 16 or greater, pursuant to § 3E1.1(a) and (b).

Accordingly, the applicable offense level is 31.

On September 5, 1987, Defendant possessed cocaine with intent to sell it and was charged with Criminal Possession of a Controlled Substance in the 3rd Degree. On February 23, 1988, Defendant was sentenced in Westchester County Court, White Plains, NY to 1 to 3 years' imprisonment. On November 3, 1988, Defendant was paroled and on February 23, 1991, he was

11

discharged from parole.  Pursuant to § 4A1.2(e)(3), this conviction warrants zero criminal history points.

On October 13, 1995, in Queens, New York, Defendant was arrested after possessing 14 kilograms of cocaine.  On June 4, 1996, Defendant was charged and sentenced to 5 to 10 years' imprisonment for Conspiracy in the 2nd Degree: Intent to Perform a Class A Felony in Queens Country Supreme Court, in Queens, NY.  On October 10, 2000, Defendant was paroled.  According to parole records, the Defendant violated the conditions of parole when he left the State of New York without permission on December 10, 2001, and went to Florida.  He also violated the conditions of parole when he was arrested on I-95 in North Carolina.  The records reflected that there were no charges brought against Defendant in that case and that a parole warrant was faxed to the Robeson County Sheriffs Office in North Carolina.  His parole was revoked on April 2, 2002.  He was discharged from parole on May 3, 2004.  Pursuant to §§ 4A1.1(a) and 4A1.2(e)(1), this conviction warrants three criminal history points.

A total of three criminal history points establishes a Criminal History Category of II, pursuant to the table at Chapter 5, Part A, of the Guidelines.

12

Based on a total offense level of 31 and a Criminal History Category of II, the Guidelines range for imprisonment is 121 to 151 months.

The Guidelines range for a term of supervised release is four years on each count, pursuant to § 5D1.2(c).

Defendant is not eligible for probation because the instant offense is one for which probation has been expressly precluded by statute, pursuant to § 5B1.1(b)(2).

The fine range for the instant offense is from $15,000 to $5,000,000, pursuant to §§ 5E1.2(c)(3)(A) and (c)(4). Subject to Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,407.78 to be used for imprisonment, a monthly cost of $286.11 for supervision, and a monthly cost of $2,180.27 for community confinement.

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a downward departure from the Guidelines sentence is warranted in the instant case.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant." Pursuant to 18 U.S.C. § 3553(2)(A), the Court weighs the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Tueros' arrest history consists of offenses that occurred over seven years ago. He has reported that he has smoked marijuana and disclosed that he tried cocaine 10 times, the last time was in 2008. Tueros reported no other history of drug use and informed that he completed a drug treatment program while previously in the custody of the New York State Department of Corrections.

As reported in the PSR, Tueros has had a long employment history. He reported that from 2004 or 2005 until his instant arrest, he owned what he described as a "small production company" with his wife and his cousin, Salvador Madera. Tueros said that the company was called "Rising Phoenix Enterprises" and that it is based in New York. He related that they had camera equipment, lights, etc., and produced music videos, documentaries, low budget movies and commercials. From 2002 to 2004, Tueros was reportedly employed full-time as a maintenance worker for Sterling Management, Inc., which he noted owned various residential properties in New York. He related that he was paid $15.00 an hour until he suffered a back injury and received disability income for a period of time. Tueros informed that he worked as a limousine driver for GK Limo in

Tappan, New York, on an intermittent basis from 2001 to 2003. The defendant indicated that he worked as a taxi driver for the New York City Taxi and Limousine Commission ("TLC") for six to eight months in 2002. Tueros reported that during the 1990's, he worked for a grocery store owned by his mother and also worked for an uncle's travel agency and accounting business. He informed that he became a licensed insurance broker (property, casualty and liability) in New York in 1992 and did so in connection with his uncle's accounting business. He said that such license is no longer valid. According to the New York State Department of Financial Services in Albany, New York, the defendant was licensed as a broker from December 16, 1991, to October 31, 1993. Tueros has advised that he intends to get his commercial driver's license and work as a truck driver upon his release from custody.

Tueros is 43 and married, and his relationship with his wife appears strong. They have one two year old child. According to the PSR, Defendant's family has remained emotionally supportive since his arrest.

Tueros also reported that he is currently attending a Positive Lifestyle class at the Metropolitan Correctional Center

("MCC") in Manhattan. He noted that it is a six to eight month class and that one of the topics covered is substance abuse. The defendant informed that he completed other classes while in custody at the MCC such as a Drug Abuse Education Course and Inmate Companion Training. He showed the undersigned certificates of completion during the presentence interview. Tueros also noted that he was previously working in the kitchen as a baker but hurt his hand. He expects to be able to resume such employment.

In light of the nature and circumstances of the offense, the history and characteristics of the Defendant, the need for the sentence to promote respect for the law and to provide just punishment for the offense, the Court finds that a downward departure from the Guideline sentence is appropriate to impose a sentence "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a).

**The Sentence**

For the instant offense, Tueros will be sentenced to 80 months' imprisonment and 4 years' supervised release.

17

Tueros is directed to report to the nearest United States Probation Office within seventy-two hours of release to commence his term of supervised release. It is recommended that Defendant be supervised by the district of his residence.

As mandatory conditions of his supervised release, Tueros shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; and (4) cooperate in the collection of DNA as directed by the probation officer. The mandatory drug testing condition is suspended due to imposition of a special condition requiring drug treatment and testing.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions:

(1) Defendant shall provide the probation officer with access to any requested financial information.

(2) Defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless Defendant is in compliance with the

installment payment schedule.

(3) Defendant will participate in a program approved by the United States Probation Office, which program may include testing to determine whether the defendant has reverted to using drugs or alcohol. The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer. The Defendant will be required to contribute to the costs of services rendered (co-payment), in an amount determined by the probation officer, based on ability to pay or availability of the third-party payment.

(4) Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

As a result of committing the offense in Count 1, Defendant shall forfeit to the United States, pursuant to 18 U.S.C. §§ 1963(a)(1), (a)(2), and (a)(3), all property real and personal, involved in the offense or traceable to such property.

A special assessment of $100, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for December 3, 2012.

It is so ordered.

New York, NY
November 16, 2012

ROBERT W. SWEET
U.S.D.J.